UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| MIGUEL A. LARA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:10-CV-00049-BG |
| | ) | ECF |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**Statement of the Case**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Miguel A. Lara seeks judicial review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Lara did not consent to proceed before the United States Magistrate Judge, and therefore the undersigned now files this Report and Recommendation.

An Administrative Law Judge (ALJ) held a hearing on April 16, 2009, and determined on June 22, 2009, that Lara was not disabled. Specifically, the ALJ determined that Lara was capable of making a successful adjustment to work that exists in significant numbers in the national economy based on the testimony of a vocational expert in response to a hypothetical question. The Appeals Council denied review on March 5, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision "includes the Appeals Council's

1

denial of [a claimant's] request for review").

## Factual Background

Lara cannot speak or understand English and has a sixth grade education completed in Mexico. (Tr. 29, 98.) He previously worked as ginner, roustabout, and ginner's helper. (Tr. 106.) Lara reported that he repaired gin equipment and supervised six people as a ginner. (Tr. 107.) According to Lara, the heaviest weight he lifted in that job was one hundred pounds, and he frequently lifted fifty pounds. *Id.* Lara stated that he dug, repaired pipes, and replaced belts as a roustabout. (Tr. 108.) According to Lara, the heaviest weight he lifted in that job was fifty pounds, and he frequently lifted twenty-five pounds. *Id.* Lara reported that he worked a press, tied bands to bales of cotton, and repaired machinery as a ginner's helper. (Tr. 109.) Lara stated that the heaviest weight he lifted in that job was one hundred pounds, and he frequently lifted fifty pounds. *Id.*

Lara claims that he became disabled on December 6, 2007, when his left hand got caught in a saw while he was working at a cotton gin. (Tr. 79–80, 99, 137.) He was taken to the hospital where he was given intravenous pain medication and examined by Chantal C. McNair, M.D. (Tr. 132, 137–42.) Dr. McNair reported that the accident completely degloved four fingers on Lara's left hand and spared his thumb, which had good sensation and movement. (Tr. 137.) According to Dr. McNair, Lara's right hand was his dominant hand, and a language barrier prevented her from obtaining a full history. *Id.* Alan Miller, M.D. reviewed x-rays of Lara's left hand and forearm. (Tr. 140–41.) Dr. Miller reported that Lara's forearm had no acute fracture or dislocation. (Tr. 140.) He further reported that Lara's hand showed comminuted fractures of four of Lara's fingers and associated soft tissue injury in his hand. (Tr. 141.)

2

Later that day, orthopedic surgeon Stanley Lehman, M.D. examined Lara and performed surgery to stabilize Lara's left hand. (Tr. 158–64.) Dr. Lehman reported that he reconstructed the fingers "as best as possible" but also used an interpreter to discuss the possible loss of these fingers with Lara and his family due to the substantial soft tissue injury. (Tr. 159, 163.)

On December 11, 2007, Dr. Lehman performed additional surgical wound irrigation, debridement, amputation of four fingers, and soft tissue rearrangement to Lara's left hand. (Tr. 153–57.) According to Dr. Lehman, Lara's thumb appeared "quite functional" but further soft tissue loss and necrosis were possible. (Tr. 154–55.) On December 14, 2007, Dr. Lehman performed additional surgical debridement of Lara's left hand and noted that the hand would likely require further surgical attention in four to five days. (Tr. 150–51.) On December 18, 2007, Dr. Lehman performed another surgery to revise Lara's prior amputation and block nerves for postoperative pain control. (Tr. 146–49.)

Lara was discharged from the hospital in stable condition on December 19, 2007, with instructions to take all medications as prescribed and keep his dressings clean and hand elevated. (Tr. 144.) He could do physical activity as tolerated. *Id.* On December 26, 2007, Dr. Lehman examined Lara at a follow-up appointment and reported that he was healing appropriately. (Tr. 191.) At another follow-up appointment on January 9, 2008, Dr. Lehman reported that Lara was in no apparent distress, but his thumb was quite stiff. (Tr. 188.) According to Dr. Lehman, Lara would "need a period of time to work on range of motion" to start moving his wrist and thumb. *Id.* Dr. Lehman restricted Lara from all work through February 9, 2008. (Tr. 190.)

On January 22, 2008, Dr. Lehman evaluated Lara's functional capacity for an insurance company. (Tr. 178–79.) According to Dr. Lehman, Lara's prognosis was total disability for

purposes of his prior occupation but not for other work. *Id.* Dr. Lehman stated that Lara was incapable of grasping, lifting, and pinching with his left hand, but he anticipated marked changes in the next three to six months (longer if Lara needed more surgery). *Id.*

At a follow-up appointment with Dr. Lehman on January 31, 2008, Lara reported that he was trying to do flexion and extension exercises with his wrist, but he had difficulties due to stiffness. (Tr. 184.) Dr. Lehman found that Lara had limited motion in his hand, stiffness in his thumb, and extreme stiffness and decreased range of motion in his wrist. *Id.* He ordered hand therapy to increase Lara's range of motion in his thumb and wrist and restricted Lara from all work through March 10, 2008. (Tr. 185, 187.)

Dr. Lehman reported that Lara's son, who spoke fluent English, served as interpreter at an appointment on February 5, 2008. (Tr. 182.) Office staff who spoke Spanish also assisted at the appointment. *Id.* According to Dr. Lehman, Lara reported some fluid drainage from his wound but no increase in pain or swelling in his arm, wrist, fingers, elbow, or shoulder. *Id.* Dr. Lehman found that Lara's legs and right arm had functional range of motion without pain. (Tr. 183.) He further reported that Lara had 5/5 grip strength in his right hand and 5/5 strength in both knees. *Id.* According to Dr. Lehman, three to four millimeters of bone was present on the surface of one finger, but Lara showed no discomfort with palpitation of the area. *Id.* Dr. Lehman also noted that Lara was attending occupational therapy. *Id.*

On February 27, 2008, Dr. Lehman examined Lara for complaints of left hand and shoulder pain. (Tr. 210–11.) According to Dr. Lehman, the nail bed was not completely excised from Lara's amputation wounds, and he was growing a nail out of his middle finger stump which was extremely painful and tender to palpation. (Tr. 210.) Dr. Lehman reported that Lara had been attending hand

therapy to increase his range of motion in his wrist and decrease swelling and sensitization. *Id.* According to Dr. Lehman, Lara stated that he tried to work out the pain in his left shoulder but was having difficulty due to stiffness. *Id.* Dr. Lehman found that Lara had limited range of motion in his shoulder and slight atrophy of the shoulder musculature. (Tr. 211.) Dr. Lehman reported that it was difficult to assess other aspects of the shoulder because Lara could not get it high enough. *Id.* Dr. Lehman scheduled an outpatient procedure to have Lara's nail removed and recommended continued occupational therapy for range of motion and strengthening of his shoulder. *Id.* Dr. Lehman noted that the treatment for the shoulder would be the same whether the symptoms were due to a rotator cuff tear or stiffness due to lack of use since the injury. *Id.* He recommended a shoulder MRI if problems continued. *Id.*

Patty Rowley, M.D. reviewed Lara's medical records and evaluated his physical residual functional capacity on February 28, 2008. (Tr. 194–201.) Dr. Rowley found that Lara could occasionally lift twenty pounds and frequently lift ten pounds. (Tr. 195.) Dr. Rowley also found that Lara was limited in his ability to push and pull with his upper extremities due to the amputation of his fingers. (Tr. 195.) Dr. Rowley reported that Lara was limited to climbing ladders, ropes, and scaffolds only occasionally but had no other postural limitations. (Tr. 196.) According to Dr. Rowley, Lara could never handle, finger, or feel with his left hand due to his amputation. (Tr. 197.) Dr. Rowley stated that the limitations due to the symptoms of Lara's impairment were supported by the evidence of record, and she expected him to achieve the RFC outlined in her evaluation within twelve months of the alleged date of onset. (Tr. 199.) Roberta Herman, M.D. affirmed Dr. Rowley's RFC assessment on June 9, 2008. (Tr. 246.)

On March 24, 2008, Dr. Lehman performed another surgery to revise Lara's amputation and

5

remove a fragment of exposed bone that he had previously mistaken as a hook nail. (Tr. 238–39.) He examined Lara for a follow-up appointment and complaints of left hand and shoulder pain on April 16, 2008. (Tr. 208.) According to Dr. Lehman, Lara was having pain and discomfort from extreme tightness of skin over exposed areas of bone that Dr. Lehman was trying to preserve to salvage the length of his fingers. *Id.* Dr. Lehman reported that a small area of exposed bone was removed that day in the clinic, but Lara would have to undergo a more proximal amputation in the future. *Id.*

Kenneth Ratajczak, M.D. reviewed an x-ray of Lara's chest and noted minimal degenerative joint disease of the thoracic spine on April 30, 2008. (Tr. 227.) Dr. Ratajczak reported that this problem marked a change since Lara's prior chest x-ray dated March 13, 2008. *Id.*

On May 2, 2008, Dr. Lehman performed surgery to revise Lara's amputation, remove exposed bone, and block nerves for postoperative pain control. (Tr. 221–23.) After surgery, Dr. Lehman instructed Lara not to bear weight with his left arm. (Tr. 222.) At a follow-up appointment on May 21, 2008, Dr. Lehman reported that there was no swelling at the operative site and no sign of exposed bone. (Tr. 261.) He also reported that Lara was in no apparent distress and had forty-five degree extension and flexion of his wrist. *Id.* Dr. Lehman restricted Lara from returning to work through July 30, 2008. (Tr. 262.)

After a follow-up appointment on June 25, 2008, Dr. Lehman reported that Lara essentially had a thumb with an opposing stump that was hyposensitive and did not provide a very facile grip or pinch. (Tr. 257.) Upon Lara's request, Dr. Lehman wrote a prescription for a cosmetic prosthesis. *Id.* Dr. Lehman also signed a Texas Workers' Compensation Work Status Report indicating that Lara could return to work but was restricted from using his left hand. (Tr. 259.)

On August 20, 2008, Dr. Lehman again examined Lara, who reported that he was able to grip to some degree using the thumb and the fused portion of the index and long fingers. (Tr. 254.) Dr. Lehman found that Lara used his left hand "mainly as an assistive device" and could not use it to pick up objects off of a table *Id.* He also found that Lara had good sensation in his palm but numbness on the distal portion of his amputee stump. *Id.* Dr. Lehman concluded that Lara would be able to use his hand "but not in any repetitive work-type situation[.]" *Id.* Dr. Lehman also stated that Lara would not have a very facile grip or pinch, but he would be able to grasp to some degree. *Id.* According to Dr. Lehman, there was a chance that Lara would need additional surgery, but it appeared unlikely because Lara was happy and stable at present. (Tr. 255.) On the same date, Carole Dentino, M.D. reviewed x-rays of Lara's left hand and found evidence of diffuse osteoporosis probably due to disuse. (Tr. 277–78.)

On September 10, 2008, Dr. Lehman evaluated Lara's functional capacity for an insurance company. (Tr. 250–51.) Dr. Lehman reported that Lara was severely limited and incapable of minimal sedentary work. (Tr. 250.) According to Dr. Lehman, Lara's prognosis was total impairment for purposes of his prior occupation but not for one-handed work. *Id.* Dr. Lehman indicated that he did not expect a marked change from this prognosis in the future. *Id.*

On November 20, 2008, Dr. Lehman examined Lara, who reported that his left hand started swelling and draining clear fluid approximately two weeks prior. (Tr. 290–92.) Dr. Lehman arranged for Lara to have an outpatient procedure to fix the problem and prevent future infection. *Id.* On December 5, 2008, Dr. Lehman performed a procedure to remove dead bone from Lara's hand. (Tr. 288.) At a follow-up appointment with Dr. Lehman on December 18, 2008, Lara stated that his hand was sore but he was attempting to use it. (Tr. 286.) Dr. Lehman doubted that Lara

7

would have any further problems and reported that Lara had a pinch grip between the thumb and stumps of his fingers. *Id.*

On February 12, 2009, Dr. Lehman examined Lara, who reported tingling in his hand. (Tr. 283.) Dr. Lehman found that Lara's left shoulder, elbow, wrist, and thumb had normal alignment and functional range of motion without pain. (Tr. 284.) Dr. Lehman reported that Lara had a pinch grip between his left thumb and first fingers and was able to hold a piece of paper. *Id.* Dr. Lehman also found that Lara had 5/5 thumb function and did not foresee him having any further problems from his amputation. *Id.*

Dr. Lehman examined Lara for complaints of left shoulder pain on April 8, 2009. (Tr. 295.) An interpreter was present at the appointment. *Id.* According to Dr. Lehman, Lara stated that his shoulder gradually became stiff, and he was unable to lift it overhead. *Id.* Lara reported no tingling, numbness, or neck discomfort. *Id.* Dr. Lehman found that Lara had tenderness in his biceps, difficulty with horizontal abduction and adduction, and less than full range of overhead motion. *Id.* He also found that Lara had almost normal posterior shoulder motion. *Id.* He discussed options with Lara who opted for non-operative treatment, including local heat application and continuing to move his wrist and hand. *Id.*

On April 16, 2009, Lara testified at a hearing before the ALJ with the assistance of an interpreter. (Tr. 24–30.) Lara was represented by a non-attorney representative at the hearing. (Tr. 13.) A vocational expert also testified. (Tr. 31–33.)

## Standard of Review

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

8

death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. § 404.1520(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's residual functional capacity (RFC), defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1520(a)(4)(iv)–(v), 404.1545(a)(1) (2011).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) (2011) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v.*

9

*Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Discussion

Lara contends that the ALJ's decision is not supported by substantial evidence for several reasons. Among Lara's contentions is that the hypothetical question posed to the vocational expert requires remand because it assumed that Lara could use his left hand as a helper hand, which was not supported by substantial evidence. (Pl.'s Br. 11–12.) The undersigned has considered the arguments of the parties, administrative record, and applicable law and is of the opinion that this argument has merit and requires remand.[1]

Where an ALJ bases a determination of non-disability on the testimony of a vocational expert in response to a hypothetical question, the hypothetical question is defective and constitutes reversible error if either of the following is true:

1. The hypothetical question did not incorporate reasonably all disabilities of the claimant recognized by the ALJ, or

2. The claimant or his representative was not afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical question (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question).

---

[1] Lara also argues that the hypothetical question posed to the vocational expert did not sufficiently account for limitations arising from Lara's illiteracy and shoulder injury. (Tr. 13–16.) The ALJ sufficiently accounted for Lara's illiteracy when he predicated the hypothetical question on illiteracy, inability to speak English, and complete lack of education in the United States. (Tr. 31.) The ALJ sufficiently accounted for Lara's shoulder injury when he predicated the hypothetical question on an inability to do any overhead work. *Id.* Substantial evidence supports the ALJ's conclusion that Lara was not otherwise limited by his shoulder injury. For example, on June 25, 2008, and September 10, 2008, Dr. Lehman released Lara to work with restrictions only for his left hand, not for his shoulder. (Tr. 21, 250, 259.) On February 12, 2009, Dr. Lehman found that Lara had normal alignment and functional range of motion without pain in his left shoulder, elbow, wrist, and thumb. (Tr. 284.) On April 8, 2009, Dr. Lehman found that Lara was unable to lift his shoulder overhead due to stiffness but had almost normal posterior shoulder motion and no tingling, numbness, or neck discomfort. (Tr. 19, 295.) For the foregoing reasons, the ALJ sufficiently addressed Lara's illiteracy and shoulder injury.

*Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question requires remand under the first prong if it fails to incorporate limitations that are recognized by medical experts and "not contradicted by other testimony or records." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

In the instant case, the ALJ predicated the hypothetical question posed to the vocational expert on the ability to use the left hand as a helper hand. (Tr. 31.) As a preliminary matter, the court notes that it cannot determine precisely what the ALJ meant by "helper hand." The ALJ's decision and hypothetical question indicate that the meaning he intended contemplated use of a helper hand for work purposes but not for handling, fingering, or feeling. (Tr. 16, 31.) The term is not otherwise defined in the ALJ's decision or the applicable regulations.

Although the administrative record suggests that Lara enjoys some function in his left hand, it does not support a finding that he can use his left hand for work purposes. The only evidence directly on point in this regard is a statement from Lara's treating physician, Dr. Lehman, who found that Lara was able to use his left hand "but not in any repetitive work-type situation[.]" (Tr. 254.) On other occasions, Dr. Lehman found that Lara was able to do only one-handed work and work that did not involve use of his left hand. (Tr. 250, 259.) The only other physicians of record to evaluate Lara's hand function were state agency medical consultants (SAMCs) who reviewed Lara's medical records and determined, among other things, that he could never handle, finger, or feel and was limited in his ability to push and pull with his left hand. (Tr. 195, 197, 246.) The findings of the SAMCs do not contradict Dr. Lehman's findings.

Because the ALJ predicated his hypothetical question on the ability to use the left hand as a helper hand, the vocational expert identified only jobs in the national economy that could be done "pretty much one-handed," not entirely one-handed. (Tr. 31–32.) This testimony does not constitute

11

substantial evidence to support a finding of non-disability because the hypothetical question did not incorporate the limitation described by Dr. Lehman, which was not contradicted by other testimony or records. *See Boyd*, 239 F.3d at 706–08. Accordingly, remand is required.

## **Conclusion**

For the foregoing reasons, this court recommends that the United States District Court **REVERSE and REMAND** the Commissioner's decision for administrative proceedings consistent with this opinion.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: September 12, 2011.

_____
NANCY M. KOENIG
United States Magistrate Judge